UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| Cook Biotech Incorporated and Purdue Research Foundation | ) ) ) |
| Plaintiffs and Counter-Defendants, | ) ) ) ) |
| v. | ) ) Case No. 4:03CV0046 |
| ACell, Incorporated, Stephen F. Badylak, and Alan R. Spievack, | ) ) ) ) ) |
| Defendants and Counter-Plaintiffs. | ) ) ) |

**MEMORANDUM, ORDER AND OPINION**

This matter is presently before the court on Purdue Research Foundation's ("PRF") motion for summary judgment on Defendant Stephen Badylak's contract counterclaim and PRF's motion for summary judgment on Defendant Alan Spievak's contract counterclaim. PRF also moved in the alternative that this Court dismiss Spievak's claim for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).  PRF argues in both motions that summary judgment is appropriate due to lack of contract formation with PRF, the dismissal of Purdue University from this case, and the Eleventh Amendment bar.

Also before the Court is PRF's motion for summary judgment on the breach of fiduciary duty counterclaim of Defendants Stephen Badylak and Alan Spievak.  PRF argues that summary judgment is appropriate because an ordinary course contract cannot give rise to a fiduciary duty obligation.

These motions involve overlapping facts and issues of law and will therefore be

addressed together here.  For the reasons stated below, PRF's motions for summary judgment are granted.

## FACTUAL BACKGROUND

The Court will attempt to briefly outline the most salient facts involved in the respective counterclaims of Dr. Badylak and Dr. Spievak**.**

Dr. Badylak was employed at Purdue University from roughly 1978 through October 6, 2002.  During that time he developed inventions of extracellular matrix ("ECM") technologies, two categories of which are relevant here: 1) small intestinal submucosa ("SIS") technologies, and 2) urinary bladder submucosa ("UBS") and other Non-SIS technologies.  Amended Counterclaim ¶¶ 15-17, 65-66.  Badylak alleges that PRF has breached "executed agreements" by failing to pay Badylak royalties and other proceeds from his inventions of ECM technologies.  Badylak argues that "disclosure documents" and the "assignment and royalty and pool distribution documents create express written contracts" between Badylak and PRF.  Brief in Opposition at 15; Badylak Decl. Exs. 8 to 43.  He also states that these agreements are "further memorialized in documents including, but not limited to": 1) an October 27, 1995 letter from Purdue University Executive Vice President and Treasurer Dr. Fred Ford to Badylak; and 2) Purdue University Memorandum No. B-10.  Badylak Resp. to PRF Interrogatory No. 15, Docket No. 308, Attachment 1.  The October 27, 1995 letter agreement is for "Distribution of the SIS related Income" and incorporates by reference Purdue University Executive Memorandum B-10.  Docket No. 308, Attachment 2.  The Court finds it worthwhile to include cited portions of Executive Memorandum B-10:

a. This Memorandum as amended from time to time shall be a part of the

        conditions of employment of every employee of the University and a part of the conditions of enrollment and attendance at the University by students. (VI.1)

b.     The University shall own all domestic and foreign rights in and to any and all inventions and Materials made or developed by University personnel either in the course of employment by the University, or through the use of facilities or funds provided by or through the University. (III.1)

c.     Inventions will be considered as having been developed in the course of employment where conception and/or development is in the individual's subject area of principal competence in scholarly activities for which the individual is employed. (III.2.b)

d.     All inventions and materials which may belong to the University under the provisions of this Memorandum, except computer programs obviously without significant commercial value, shall be promptly reported in writing by the University personnel concerned through the appropriate department head and dean to the Committee. . . The participants shall furnish such additional information and execute such documents from time to time as the Committee may reasonably request. (V.1)

e.     It is the policy of Purdue University to encourage and recognize the creative efforts of University personnel and, insofar as the Board of Trustees of the University deems it consistent with the public interest, to share the financial awards of such efforts on an equitable basis. This general policy may be rescinded or amended at any time by the University, and it is not intended to and does not create any legally enforceable rights whatsoever in any University personnel in respect to any present or future Invention, Written Material, or Recorded Material. (IV.1)

f.     The Committee on Patents and Copyrights (the Committee) shall determine: . . .

    2.     whether the University personnel shall be entitled to share in the net proceeds of such Inventions and Materials and, if so,

    3.     what the respective equities of the University and of the University personnel shall be. (IV.2.a)

g.     Notwithstanding any determination by the Committee, or any other provision of this Memorandum, University personnel shall have no

        equities or rights whatsoever in Inventions and Materials belonging to the University unless and until a written agreement has been executed by the University and the University personnel consistent with the determination of the Committee. (IV.2.d)

  h.      Notwithstanding any determination made by the Committee, or any other provision of this Memorandum, the University reserves the sole right to negotiate and enter into contracts for the exercise, sale, or other disposition of any and all rights in Inventions and Materials belonging to the University, under Section III herein, on such terms and conditions and for such consideration, if any, as the University shall determine, and University personnel shall have no rights with respect thereto except the right to receive such share of the net proceeds, if any, as the Committee determines . . . (IV.2.g)

Badylak's contract counterclaim was first filed on September 15, 2003 against Purdue University and Purdue Research Foundation. On December 1, 2003, Defendants dismissed all of their claims against Purdue University in this case, including Badylak's contract claim with respect to Purdue University.

Dr. Spievak is also an inventor of ECM technologies including "Extracellular Matrices as Scaffolds for Head and Neck Reconstruction and SIS-Vocal Cord Repair technology." Spievak Statement of Material Facts, ¶ 2. He alleges that he PRF formed contracts with him which obligated PRF to distribute ECM license-related proceeds to him.

Spievak's contract counterclaim was first filed on September 15, 2003 against Purdue University and PRF. On December 1, 2003, that claim was dismissed with respect to Purdue University.

Badylak and Spievak also allege that PRF had a fiduciary duty to oversee the payment of royalties and license proceeds and make proper payments to the inventors or inventors' pool for ECM licenses granted by PRF. Amended Counterclaim, ¶ 69. They allege that PRF breached this fiduciary duty. The fiduciary duty counterclaim was first filed on September 15, 2003. An

amended counterclaim was filed on December 22, 2004.

## STANDARD OF REVIEW

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Celotex Corp v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Bragg v. Navistar Int'l Trans. Corp.*, 164 F.3d 373 (7th Cir. 1998). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56.

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex*, 477 U.S. at 324 (quoting FED.R.CIV.P. 56); *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497 (7th Cir. 1998). A question of material fact is a question which will be outcome determinative of an issue in the case. The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson*, 477 U.S. at 248. Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts shows that there is a genuine [material] issue for trial.'" *Id.* The nonmoving party cannot rest on its pleadings, *Weicherding v. Riegel*, 160 F.3d 1139 (7th Cir. 1998); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918 (7th Cir. 1994); nor may that party rely upon conclusory allegations in affidavits. *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 320 (7th Cir. 1995).

During its summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). Furthermore, it is required to analyze summary judgment motions under the standard of proof relevant to the case or issue. *Anderson*, 477 U.S. at 252-55. Applying the above standard this Court will now address the present motion for summary judgment.

## DISCUSSION

**BADYLAK'S CONTRACT COUNTERCLAIM**

The Eleventh Amendment effectively bars suits against Purdue University in this case. Purdue University was dismissed as a party to this case on December 1, 2003. Therefore, an essential question is whether Badylak contracted with PRF or with Purdue University. If he contracted only with Purdue University, a non-party to this case, his counterclaims must be dismissed.

As the Indiana Supreme Court has stated, "[t]hree rudimentary elements must be present before an agreement may be considered a contract: offer, acceptance of the offer and consideration. *Straub v. B.M.T.*, 645 N.E.2d 597, 598 (Ind. 1994)(citations omitted). Additionally, a "meeting of the minds of the contracting parties, having the same intent, is essential to the formation of a contract." *Zimmerman v. McColley*, 826 N.E.2d 71, 77 (Ind. Ct. App. 2005). To determine the relevant intent of the parties, the Court must look, not to the subjective beliefs or intents of the parties, "but to their outward manifestations of it." *Id*.

Badylak alleges breach of "express written contracts between Dr. Badylak and PRF." Brief in Opposition at 15. He claims that "disclosure documents and the assignment and royalty

6

and pool distribution documents constitute express written contracts between [him] and PRF."
*Id*. Purdue University Executive Memorandum B-10, however, requires that Purdue University personnel complete such disclosure documents. Executive Memorandum ¶ d. Additionally, the disclosures designated by Badylak demonstrate that the agreements were made with Purdue University, pursuant to Executive Memorandum B-10:

> I (We) agree with the provisions of Executive Memorandum B-10 and Business Office Memorandum 170. I (We) specifically recognize that the *Committee on Patents and Copyrights* shall as a general principle, but subject to all *relevant provisions of Executive Memorandum B-10*, award a two-third interest to the University and a one-third interest to the inventor(s) or creator(s) of the net proceeds derived from Inventions and Materials belonging to the University. I (We) hereby agree to divide said one-third interest in the proportions hereinafter specified before each signature below.

Badylak Decl., Ex. 26-43 (emph. added).

Furthermore, the "distribution documents" cannot reasonably be viewed as offers by PRF. Purdue University requires that inventors enter into written agreements with the University in order to obtain any rights to invention proceeds. Executive Memorandum ¶ g. Those distribution documents cannot, therefore, operate as independent offers from PRF, because they are conditions placed by Purdue University on Badylak's ability to receive royalty proceeds.

It is also clear that neither Badylak nor PRF has the authority to contract independently with one another regarding invention proceeds. Executive Memorandum B-10 was incorporated by reference into Badylak's employment terms and he alleges that the contract claim in this case is based, in part, upon that memorandum. Executive Memorandum ¶ a; Badylak Resp. to PRF Interrogatory No. 15, Docket No. 308, Attachment 1. According to Executive Memorandum B-10, Purdue University retains its authority to determine what invention proceeds, if any, PRF may

share with Badylak. Executive Memorandum ¶¶ f-h. It further states that 1) it "does not create any legally enforceable rights whatsoever in any University personnel in respect to any present or future invention"; 2) the Purdue University Committee on Patents and Copyrights has the authority to determine: "whether the University personnel shall be entitled to share in the net proceeds" of inventions"; and 3) University personnel have no rights in inventions "unless and until a written agreement has been executed by the University and the University personnel consistent with the determination of the Committee." Executive Memorandum ¶¶ e-h.

With respect to Badylak's "SIS technologies," there can be no reasonable dispute that his agreement for royalties is with Purdue University, not PRF. An October 27, 1995 letter to Badylak outlines his agreement regarding "SIS technologies." Badylak Decl., Ex. 8. That letter, written on Purdue University letterhead, unambiguously states that the agreement is made pursuant to Purdue University Executive Memorandum B-10. *Id*. It also clearly states that PRF is designated as a representative of Purdue University. *Id*. It clearly states that, when signed by Badylak, the letter "will constitute an Agreement between the University and you." *Id*. Because the letter governs the distribution of proceeds from "SIS technologies" and is clearly an agreement between Badylak and Purdue University, Badylak's attempts to recast his agreements as contracts with PRF are unpersuasive.

Badylak also argues that even if no written contracts were formed, he is entitled to sue for breach of an implied contract. Opposition at 19. Relief on an implied contract, however, is available only in the absence of an express contract. "[W]hen the rights of parties are controlled by an express contract, recovery cannot be based upon a theory implied in law." *Town of New Ross v. Ferretti*, 815 N.E.2d 162, 168 (Ind. Ct. App. 2004) (citations omitted). Badylak has

8

alleged the existence of such contracts here, and is therefore precluded from recovering on an implied contract claim.

Badylak's attempts to demonstrate an implied-in-fact contract are also unpersuasive. He alleges that the conduct between PRF and Badylak is sufficient to find an implied-in-fact contract. The Court is not persuaded. An implied-in-fact contract still requires proof of a "meeting of the minds" and "clear intent" of both parties to form a contract. *Dyer Constr. Co. v. Ellas Constr. Co.*, 287 N.E.2d 262, 264 (Ind. Ct. App. 1972). The documents relied on by Badylak to advance his claim clearly show that no such "meeting of the minds" or "clear intent" to contract ever existed. As noted earlier, neither Badylak or PRF had authority to contract independently with one another. At most, PRF is a third-party beneficiary of Badylak's obligations to Purdue University. *See Holloway v. Bob Evans Farms, Inc.*, 695 N.E.2d 991, 995-96 (Ind. Ct. App. 1998). ("A third party beneficiary contract exists when: (1) the parties intend to benefit the third party, (2) the contract imposes a duty on one of the parties in favor of the third party, and (3) the performance of the terms of the contract renders a direct benefit to the third party intended by the parties to contract."). Being a third-party beneficiary does not make PRF an obligor.

For all of the reasons stated above, Badylak's contract counterclaims must be dismissed in their entirety.

**SPIEVAK'S CONTRACT COUNTERCLAIM**

As in Dr. Badylak's counterclaim, the essential issue in Dr. Spievak's contract counterclaim is whether he contracted with Purdue University or PRF. If he contracted with Purdue University, his claims must be dismissed.

Dr. Spievak states, in his declaration attached to his memorandum in opposition, that he is "an inventor of ECM technologies including Extracellular Matrices as Scaffolds for Head and Neck Reconstruction and SIS-Vocal Cord Repair technology, which were disclosed to and assigned to Purdue Research Foundation," and that he "provided information to assist PRF in commercializing this invention." Spievak Decl., Ex. 1.  He points specifically to a February 19, 1999, "Invention Record and Disclosure" form (Spievak Decl. Ex. 1) and a royalty letter from May 2, 2001, (Spievak Decl., Ex. 2) as evidence of his alleged contracts with PRF.  He further states that he believed that he "had an agreement with PRF that in return for disclosing [Spievak's] invention to PRF, providing information to PRF that would assist PRF in commercializing [Spievak's] invention, and assigning [Spievak's] invention to PRF, PRF would pay [Spievak] a share of the license proceeds it obtained from [Spievak's] inventions." Spievak Decl. ¶ 9.

An examination of the February 19, 1999 , "Invention Record and Disclosure" form (Spievak Decl., Ex. 1) reveals that the document is signed by Purdue University Department head George Wodika and Purdue University dean Jeff Wright.  It is not signed by any representative of PRF.  It also clearly reveals that the agreement is "subject to all relevant provisions of [Purdue University] Executive Memorandum B-10."

Moreover, it cannot be reasonably disputed that, in its dealings with Spievak, PRF was a representative of Purdue University.  The following statement contained in an exhibit to Spievak's own declaration makes this abundantly clear:

> The undersigned hereby accepts the foregoing terms and conditions and agrees to execute, acknowledge, and deliver such assignments of rights and other instruments to Purdue Research Foundation or to any person designated by the

10

> Foundation, as may be requested by Purdue University *or by its representative*, Purdue Research Foundation, to confirm or evidence the ownership interest of the University as here and above set forth or for other purposes consistent with the Memorandum and this Agreement.

Spievak Decl. Ex. 2 at p. 2 (emphasis added).  Spievak designated his own signature to this statement and now relies on it to advance his claim.  This same document also states that pursuant to Purdue University Executive Memorandum B-10, "the University hereby designates Purdue Research Foundation as its representative to act for it in connection with this invention." *Id*.  It further states that, when signed by Spievak, the letter "will constitute an Agreement between the University and [Spievak]."  Thus, according to Spievak's own declaration, PRF's obligations arise from actions taken by PRF as a representative of Purdue University.  Under Indiana law, the remedy of one seeking to enforce a contract is against the principal and not the agent.  *Carlson Wagonlit Travel, Inc., v. Moss*, 788 N.E.2d 501, 503 (Ind. Ct. App. 2003).  The statements outlined above and Spievak's agreement to be bound by them demonstrate that he knew that PRF was acting as representative of Purdue University.  Therefore, his counterclaim is properly against Purdue University and not PRF.

Spievak also argues that, if an express contract does not exist, Spievak could recover under an implied contract.  This argument is fatally flawed, however.  It is well settled under Indiana law that relief on an implied contract is available only in the absence of an express contract.  *Town of New Ross v. Ferretti*, 815 N.E.2d 162, 168 (Ind. Ct. App. 2004); *King v. Terry*, 805 N.E.2d 397 (Ind. Ct. App. 2004); *City of Indianapolis v. Twin Lakes Enters., Inc.*, 568 N.E.2d 1073 (Ind. Ct. App. 1991).

Moreover, as was the case with Dr. Badylak's contract counterclaim, PRF has

11

successfully shown that no "meeting of the minds" or "clear intent" to form a contract existed between Spievak and PRF. Both are required to prove an implied in fact contract. *Dyer Constr. Co.*, 287 N.E.2d at 264.

For the reasons stated above, summary judgment must be granted in favor of PRF.

**FIDUCIARY DUTY COUNTERCLAIM**

Badylak and Spievak argue that, in addition to the contractual obligations addressed above, PRF owed them a fiduciary duty because a relationship of trust and confidence existed between the parties and there was disparity in the respective power of the parties.

It is well settled under Indiana law that a fiduciary relationship may not be predicated on an arm's length, contractual agreement. *Olcott Int'l & Co., Inc. v. Micro Data Base Systems, Inc.*, 793 N.E.2d 1063, 1073 (Ind. Ct. App. 2003) (The court in this royalty payment dispute stated that, "[w]hen two parties are involved in an arm's length, contractual arrangement, a fiduciary relationship may not be predicated on such an arrangement."); *Wilson v. Lincoln Fed. Savings Bank*, 790 N.E.2d 1042, 1046 (Ind. Ct. App. 2003) ("[A] business or 'arm's length' contractual relationship does not give rise to a fiduciary relationship."); *Eskew v. Cornett*, 744 N.E.2d 954, 958 (Ind. Ct. App. 2001); *Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1273 (Ind. Ct. App. 2000) ("Contractual agreements do not give rise to a fiduciary relationship creating a duty").

Additionally, the Indiana Supreme Court has recognized the temptation to convert every contract claim into a tort claim. In *Gregg Allen Constr. Co. Inc. v. Estelle*, 798 N.E.2d 171 (Ind. 2003), the court stated:

This is not a new issue. Because a tort may produce more generous damages and

12

>open the door to the possibility of punitive damages, there is obvious incentive to seek to frame a contract breach as a negligence claim.  *See, e.g., Prosser and Keeton on the Law of Torts* § 92 (W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen, eds., 5th Ed. 1984) at p. 658, (observing the "more or less inevitable efforts of lawyers to turn every breach of contract into a tort.").

*Id.* at 173.

In light of the well-established rule that contractual agreements do not give rise to a fiduciary duty, it is clear that Badylak and Spievak must demonstrate the existence of an independent fiduciary relationship that arose from circumstances beyond the underlying contractual duties and obligations of PRF.

Badylak and Spievak have failed, however, to cite to a single Indiana Authority recognizing the existence of a fiduciary duty between a patent assignee, such as PRF, and a patent assignor.  Instead, they cite only to a 1957 California case: *Stevens v. Marco*, 305 P.2d 669, 679 (Cal. App. 1957), to support such a proposition.

In fact, the applicability of the *Stevens* case to the case here was placed in serious doubt by the California Court of Appeal decision in *Wolf v. Superior Court*, 130 Cal. Rptr. 2d 860 (Cal. App. 2003).  In that case, Wolf, the creator of the story and characters for the movie *Who Framed Roger Rabbit?*, sued Disney, alleging that he had not received profit-sharing proceeds as promised him under the contract.  Wolf alleged both breach of contract and breach of fiduciary duty.  The court of appeals affirmed the trial court's dismissal of the fiduciary duty claim on the pleadings.  *Id*. The facts in Wolf are not unlike the facts here:

>According to the complaint, each time Wolf attempted to exercise its audit rights, Disney failed to provide access to pertinent records.  In addition, Disney allegedly underreported revenues it received in connection with the Roger Rabbit characters and failed to disclose the nature of its third-party agreements concerning the characters and the compensation received.  Wolf alleges such conduct not only

13

>constitutes a breach of contract but also amounts to a breach of fiduciary duty. Wolf claims that Disney is a fiduciary because Disney "enjoyed control over the books, records, and information concerning the exploitation [of Roger Rabbit characters] and the revenue and Gross Receipts Royalties derived therefrom."

*Id*. at 862-63.

The court further stated that "the contractual right to contingent compensation in the control of another has never, by itself, been sufficient to create a fiduciary relationship." *Id*. at 864. The court rejected as "without merit" "Wolf's contention that a fiduciary relationship exists because he necessarily reposed 'trust and confidence' in Disney to perform its contractual obligation -- that is, to account for and pay Wolf the contingent compensation agreed upon in the contract." *Id*. As the court noted, this is simply a truism of contract law: "Every contract requires one party to repose an element of trust and confidence in the other to perform." *Id*.

The court expressly distinguished its case from *Stevens* because there was no "joint venture" or similar relationship between the parties. *Id*. at 865. As Badylak and Spievak have not alleged that they were engaged in a joint venture with PRF, there would be no fiduciary relationship in this case even under California law.

Because no fiduciary relationship existed between the parties as a matter of law, summary judgment on the breach of fiduciary duty counterclaim must be granted in favor of PRF.

14

## CONCLUSION

For the reasons stated above, PRF's motions for summary judgment on Badylak's contract counterclaim, Spievak's contract counterclaim, and Badylak and Spievak's breach of fiduciary duty counterclaim are **GRANTED**.

**IT IS SO ORDERED.**

**Date: June 21, 2005**

**S/ ALLEN SHARP**
**ALLEN SHARP, JUDGE**
**UNITED STATES DISTRICT COURT**
